1

2

3

4

5

6

7

8

### UNITED STATES DISTRICT COURT

9

EASTERN DISTRICT OF CALIFORNIA

10

11 RHONDA LEE MCINTIRE,                    Case No.  1:14-cv-00036-SKO

12              Plaintiff,

13                                         **ORDER ON PLAINTIFF'S COMPLAINT**

14      v.                                 (Doc. 1)

15

16 CAROLYN W. COLVIN,
   Acting Commissioner of Social Security,

17              Defendant.

18 _____

19

20          **I.    INTRODUCTION**

21      Plaintiff, Rhonda Lee McIntire ("Plaintiff"), seeks judicial review of a final decision of the

22 Commissioner of Social Security (the "Commissioner") denying her application for Supplemental

23 Security Income ("SSI") benefits pursuant to Title XVI of the Social Security Act.   42 U.S.C.

24 § 1383(c)(3).[1]   The matter is currently before the Court on the parties' briefs, which were

25 _____

26 [1]    In her January 19, 2012, application for disability insurance benefits ("DIB") and SSI benefits pursuant to Titles
   II and XVI of the Social Security Act, Plaintiff claimed to have been disabled since March 2, 2001.  (AR 218-230;
27 232.)  Plaintiff was only insured for DIB through 2009; to be eligible for DIB, however, a claimant must establish
   eligibility while still insured for benefits.  42 U.S.C. § 423(c); *Tidwell v. Apfel*, 161 F.3d 599 (9th Cir. 1998).  When
   Plaintiff amended her alleged onset date to January 18, 2012, at her hearing before the ALJ, her DIB claim was
28 thereby rendered moot.  (AR 14; 64-65; Doc. 15, p. 5.)

submitted, without oral argument, to the Honorable Sheila K. Oberto, United States Magistrate Judge.[2]

## II.   FACTUAL BACKGROUND

Plaintiff was born on June 26, 1965, and alleges disability beginning on January 18, 2012. (AR 14; 248.)   Plaintiff claims she is disabled due to anxiety, asthma, lower back problems, schizoaffective disorder, hypomania, depression, obsessive compulsive disorder, memory problems, and traumatic brain injury.  (*See* AR 252.)

## A.   Relevant Medical Evidence[3]

From 1992-1995, Plaintiff presented at Santa Clara Valley Medical Center with asthma, women's health issues, repetitive stress injury, and neck and shoulder pain.  (AR 630-62.) Plaintiff's treatment included medication, hand therapy, and physical therapy.  (AR 630-62.)

Dr. David F. Dahl, Ph.D., performed a neuropsychological evaluation of Plaintiff in November of 2001.  (AR 613-14.)  In his report, Dr. Dahl noted Plaintiff did not have "well-honed" interpersonal skills and showed some inappropriate social functioning.  (AR 614.)  Upon examination, Dr. Dahl determined Plaintiff's cognitive functioning was average and her cognitive processes were intact, her overall memory was in the average to low range, and her abilities to initiate, plan, and adapt to changes in patterns were mildly impaired.  (AR 614.)  Plaintiff's vocabulary and verbal concept formation ability were average, her awareness of social rules, judgment, and practical reasoning was average, her memory of words and her ability to use words effectively were below average, and her ability to perform calculations was below average.  (AR 614.)

From August 2008 to June 2013, Plaintiff visited National Health Services clinics for mental health services, medication refills, blood panel and thyroid tests, and treatment for women's health issues, incontinence, hyperlipidemia, asthma, bronchitis, ear cleaning, and back pain.  (*See* AR 371-452, 470-502, 513-29, 606-08, 616-29.)   On July 17, 2009, Plaintiff

---

[2]   The parties consented to the jurisdiction of a U.S. Magistrate Judge.  (Docs. 7; 8.)

[3]   As Plaintiff's assertion of error is limited to the ALJ's consideration of her subjective symptom testimony, there is no challenge to the ALJ's consideration of the medical evidence and only evidence relevant to this single argument is set forth below.

1  complained of back problems but declined a work up, instead requesting a physician's note stating

2  that for every hour of work, she be permitted to work sitting down for ten minutes.  (AR 446-47.)

3  On November 27, 2012, Plaintiff complained of pain in her neck and lumbar spine after a bus

4  accident and was prescribed Flexeril and Motrin for the pain.  (AR 470-72.)  On February 25,

5  2013, Plaintiff was prescribed physical therapy for neck tenderness and her Flexeril and Motrin

6  prescriptions were not refilled.  (AR 625-27.)

7       On June 3, 2009, Dr. Rizwana Shaheen, M.D., diagnosed Plaintiff with generalized anxiety

8  disorder and panic disorder without agoraphobia.  (AR 450-51.)  Dr. Shaheen prescribed Buspar,

9  Lorazepam, Wellbutrin, Zoloft, and Depakote to treat Plaintiff's anxiety.  (AR 420; 451.)  Over

10  the course of treatment, Plaintiff complained of anxiety about her job and financial matters (*see*

11  AR 406, 417-18, 441-42, 446-49), sadness (*see* AR 404-05, 435-36), panic attacks (*see* AR 404-

12  05), and mood instability (*see* AR 389-90).   On occasion, Plaintiff indicated her mood and

13  confidence had improved.  (*See*, *e.g.*, AR 417 (excited about a 16-day vacation), 423 (gained

14  confidence from doing crossword puzzles; reported "feeling better" and "enjoying" keeping busy

15  at work), 426 (reported "improved" mood).)

16       Examinations including the most recent examination on June 10, 2013, indicated Plaintiff's

17  mood remained anxious but her reasoning, impulse control, judgment, and insight were fair or

18  normal and appropriate.  (*See* AR 616-18; *see also* AR 396-98, 413-14, 470-72, 514-15, 524-26,

19  619-21, 622-24, 625-27, 628-29.)  Plaintiff was oriented to person, place, time, and situation, her

20  behavior was unremarkable, her affect was appropriate, her memory was intact, her intellect was

21  average, her attitude was cooperative, she maintained attention, and her thought processes were

22  logical.  (*Id.*)  Plaintiff was further assessed as having only mild or moderate impairment in the

23  occupational area, social/interpersonal skills, and activities of daily living on multiple occasions

24  (*see*, *e.g.*, AR 403, 417, 423, 426, 439, 440, 452), though her attention and concentration were also

25  repeatedly noted to be poor or distractible (*see*, *e.g.*, AR 387-92, 401, 419-20, 424, 435-36, 441-

26  42, 499-502, 606-07.)

27       On March 31, 2012, consultative examiner Dr. John Chang, M.D., performed an internal

28  medicine evaluation of Plaintiff.  (AR 503-07.)  Dr. Chang noted Plaintiff was oriented as to time,

place, person, and purpose, her memory was intact, she was in no acute distress, and she was able to move around the office without difficulty or assistance.  (AR 504-06.)  Plaintiff had range of motion within normal limits in her shoulders, elbows, wrists, hands, dorsolumbar spine, hips, knees, ankles, and feet, and only modest limitations in her cervical spine range of motion.  (AR 505-06.)  Plaintiff's straight leg raise test was negative bilaterally, she had normal motor strength, muscle bulk, and tone in her arms and legs, and her grip strength was normal in both hands.  (AR 506.)  Dr. Chang also observed Plaintiff had hyperreflexia (overreaction of the nervous system to stimulation) and asthma.  (AR 507.)  Dr. Chang opined Plaintiff could push, pull, lift or carry ten pounds frequently and twenty pounds occasionally, walk or stand up to six hours per day, did not need an assistive device, had no restrictions on sitting, could bend, kneel, stoop, crawl, and crouch frequently, could climb ladders and work with heights frequently, and had no restrictions on hearing, seeing, or using her hands for manipulative movements.  (AR 507.)

Plaintiff's treating physician, Dr. Thinh D. Mai, M.D., completed a physician's certificate for the discharge of Plaintiff's student loans on June 27, 2012.  (AR 478; *see also* AR 382-85).  In the certificate, Dr. Mai opined Plaintiff had been diagnosed with panic disorder without agoraphobia and generalized anxiety disorder and that Plaintiff had difficulty following complex instructions, working in groups, and dealing with changes or stress.  (AR 478.)  Dr. Mai indicated Plaintiff had only mild limitations in her activities of daily living, but suffered from poor social skills and difficulty in crowds or working without plans.  (AR 478.)

Dr. Mai also completed a medical source statement on Plaintiff's mental impairments on June 11, 2013.  (AR 609-12.)  Dr. Mai opined Plaintiff had schizoaffective disorder, subchronic panic disorder, and generalized anxiety disorder, but noted Plaintiff was "stable and responding well to treatment[.]"  (AR 609.)  In a check-the-box form, Dr. Mai noted Plaintiff's symptoms included inappropriate affect, hyperactivity, poverty of content of speech, grossly disorganized behavior, flight of ideas, and difficulty concentrating.  (AR 610.)  Dr. Mai opined Plaintiff had difficulty dealing with stress and was unable to understand or remember detailed instructions or carry them out, had only a limited ability to set realistic goals or make plans independently of others, had difficulty interacting with the general public but could adhere to basic standards of

neatness and cleanliness, and had no limitations traveling in unfamiliar places or using public transportation.  (AR 611.)  Dr. Mai noted Plaintiff was prone to increasing incidents of physical injuries due to her impairments and checked a box indicating loss of intellectual ability of 15 IQ points or more, but denied Plaintiff had a low IQ or reduced intellectual function.  (AR 611-12).  Dr. Mai concluded Plaintiff's impairments could be expected to last for at least twelve months and would cause her to be absent from work about three days per month.  (AR 612.)  Dr. Mai advised that Plaintiff could not sit still or work at a desk due to her anxiety, nor would she be able to perform types of work where she was moving.  (AR 612.)

**B.     Testimony**

      **1.     Plaintiff's Work History and Self-Assessment**

In a January 19, 2012, field office disability report, Plaintiff listed work history as an office services assistant with the county library, a departmental aide with the county library, a document specialist with a "DSL company," a seasonal cashier at a discount store, and a volunteer with a library.  (AR 253; *see also* AR 258.)  In her job as a departmental aide, Plaintiff shelved books, processed books being checked in and out of the library, and pushed up to five heavy carts loaded with books around the library each day.  (AR 302.)  As an office assistant, Plaintiff typed booklists, processed books being checked in and out of the library, and picked books off shelves. (AR 303.)  In all jobs, the heaviest weight Plaintiff lifted was up to 25 pounds.  (AR 302-05.)

Plaintiff completed an adult function report on March 1, 2012, noting that at that time, she lived alone.  (AR 313.)  She wakes up "only to [a] screaming meanie alarm" and sleeps fully dressed so that she does not have "to make any decisions" in the morning.  (AR 313.)  "[M]any days just getting out of bed is a major accomplishment" and there are "many days when [she is] jumping out of [her] skin all day . . . it's all [she] can do to last [a] few hours of the day, not shouting at everyone to leave."  (AR 313.)  Since her injury, Plaintiff's attention to detail has suffered dramatically and she has problems with her personal care and grooming.  (AR 314-15.)  Plaintiff requires reminders to take her medications and loses track of her medication bottles, makes sandwiches and frozen meals because she is afraid to use the stove top, and has had problems leaving the gas on overnight.  (AR 314-15.)  Plaintiff rarely does dishes because she gets

"ants[y] and overwhelmed" and only does her laundry "as needed." (AR 315.) She "rarely" goes outside aside from going to work and feels safer inside and calmer at home. (AR 316.) She finds it easier to go outside alone because "people still take emotional energy," and she shops for groceries and household items for 45 minutes once a week. (AR 316-17.)

For hobbies, Plaintiff reads, braids, watches television, paints, and collects art images for a scrapbook. (AR 317.) She "braids" "almost constantly when out" because it keeps her seated, calmed, and focused enough to listen to people. (AR 317.) Before her impairment, she was able to read and understand "those books on boring texts (data management)" and was learning "reverse engineering & pro-E" but is no longer able to comprehend them due to her head injury. (AR 317.) She attends social events three out of seven days a week if she is not "busy working," and used to attend Narcotics Anonymous meetings. (AR 317.)

Plaintiff has difficulty naming once familiar objects and is bothered by whistles and shrill voices, overwhelmed by big personalities, and has difficulty keeping on task. (AR 318.) She complains of lower back aches from shelving books, and needed a back brace and Motrin to shelve books as well as when lifting 20 pounds or standing for 3-5 hours. (AR 318-19.) Plaintiff can walk for 8 blocks, has difficulty deciphering the "practical meaning" of written instructions and remembering detailed policies, and often forgets basic job duties and instructions when not at work for four days. (AR 318.) Plaintiff does not handle stress or changes in routine well and will shake and become overwhelmed. (AR 319.) Finally, when Plaintiff becomes stressed or tired, her "arms and hands spasm." (AR 355.)

### 2.   Hearing Testimony

#### a.   Plaintiff's Testimony at Hearing

On August 14, 2013, Plaintiff testified she was married on July 13, 2013, had completed high school and four years of college, and had a B.A. in English and a Masters in Library Science. (AR 35-36.) She has a valid driver's license, but has not driven in over two decades because her "family decided that they wouldn't get [her] a car because one, they didn't think [she] could handle city driving and two, [she] was on Benadryl which at the time still had alcohol in it[.]" (AR 36-37.) Plaintiff's husband has a car and drives her around, though she is able to take public

1  transportation where it is available.  (AR 38.)  Plaintiff last worked on June 19, 2013, as a part-

2  time departmental aide/page shelving books three days a week with the Kern County Library.

3  (AR 38-39.)  Since moving to Mojave in June to get married, she has not searched for a new job.

4  (AR 39.)  She speaks, reads, and writes English.  (AR 37.)

5  Plaintiff was only able to focus at this last job "because the job had no focus.  It was do

6  this, do this, do this, do this, do this, and the longest focus time was putting a book on the shelf

7  and then it could be helping someone else, going to get donations."  (AR 44.)  Plaintiff also was

8  "always exhausted" and "frequently injured" because she "would come home from work on a six

9  and a half-hour shift feeling and looking like it was a 10-hour shift[.]"  (AR 44.)

10  Plaintiff takes Zoloft, Wellbutrin, Lorazepam, and Depakote, and as a side effect of her

11  medications, becomes "dizzy a lot . . . spacey and just unfocused[.]"  (AR 46.)  Plaintiff testified

12  she is able to bathe and dress herself, prepare simple meals, and go shopping by herself.  (AR 46-

13  47.)  Plaintiff stated that she originally worked as an office services assistant with the County

14  library, but was "demoted" to a departmental aide because "they had to cut a lot of people . . . .

15  and they had to choose or they did have to choose between two of us and [Plaintiff] was the one

16  who was demoted and/or let go."  (AR 52.)  Once another departmental aide was hired, Plaintiff

17  "was instantly taken off desk duty which means public contact and [she] was told not to -- to only

18  help if no one else was there to help" and "not [to] make independent decisions of any kind."

19  (AR 53.)

20  **b.   Medical Expert Testimony at Hearing**

21  The Medical Expert ("ME") testified that Plaintiff

22  . . . has a traumatic brain injury which causes some organicity, however, her I.Q.
   scores are still within the normal range, [and] she's a fairly intelligent person so
23  she's still -- cognitively, she's still functioning at an average level.

24  She also has a schizoaffective disorder under 12.03 that the notes state she's
   stable, she's -- and she also has an anxiety disorder under 12.06.  With this, she
25  does not meet a listing.  Her activities in daily living are mildly impaired in
   cook[ing], clean[ing], shop[ing] at times, she can draw -- this is mild impairment.
26  Social functioning is moderately impaired.  There is some social isolation which
   causes some avoidance.  However, she's able to get into a close state, get into a
27  close interpersonal relationship and get married which required a great deal of
28  social skills.  I'm going to call this moderate impairment.  Concentration,

7

> persistence, and pace is moderately impaired and there's no episodes of [decompensation] for extended periods of time.  She also does not meet the C criteria.  She can do at least simple, repetitive tasks and more in a low-stress setting which she's been doing and . . . .  Well, she had to do at least simple, repetitive tasks and probably more, but she can do at least that.

(AR 48-50.)  The ME testified Plaintiff could not be around crowds of people or perform a job with a high-production demand such as assembly-line work.  (AR 50.)  The ME again opined that despite her traumatic brain injury, Plaintiff's "I.Q. scores are still average and haven't deteriorated to a tremendous extent[,]" so Plaintiff is "still functioning at an average level . . . .  Her cognitive ability is not below average, it's normal."  (AR 50-51.)  In his opinion based on a review of the medical evidence, Plaintiff "can function as an average person right now, not above average, an average person."  (AR 51.)

### c.      Vocation Expert Testimony at Hearing

The Vocation Expert ("VE") testified that Plaintiff had past relevant work as a library assistant, Dictionary of Occupational Titles ("DOT"), 1991 WL 645964, at 249.367-046, general clerk, DOT 209.562-010, scanner operator, DOT 972.282-010, and data entry clerk, DOT 203.582-054.  (AR 58.)  The ALJ asked the VE to assume a hypothetical worker of the same age and education of Plaintiff, with the following additional limitations:

> . . . Can lift and carry 20 pounds occasionally/10 pounds frequently; can stand and walk six hours in an eight-hour period and can sit six hours in an eight-hour period; permit frequent climbing of stairs and ramps, never ladders, ropes, or scaffolds; permit frequent balancing; frequent stooping; frequent kneeling . . . . frequent crouching; frequent crawling.  Let's avoid even moderate exposure to fumes, odors, dusts, and gases and poor ventilation; and let's avoid concentrated exposure to hazardous machinery and unprotected heights.
>
> Psychological limitations: let's limit to simple, routine, repetitive tasks; let's limit to low-stress tasks that would permit only occasional changes in the work setting; low stress that would permit only occasional exercise of decision making; and only occasional exercise of judgment; interaction with both public and coworkers limit to occasional.

(AR 59.)  The VE testified that such an individual would not be able to perform Plaintiff's past relevant work, but could perform other work.  (AR 60.)  The VE identified a representative sample of work such a hypothetical individual could perform, including work as an assembler, DOT 712.687-010, sorter, DOT 222.687-014, and packer, DOT 920.687-082.  (AR 60.)  Plaintiff's

1   attorney asked the VE whether a hypothetical individual off task "twenty percent" of the time

2   would be able to perform any of these representative jobs, and the VE testified that such an

3   individual could not work.  (AR 60.)

4       The ALJ then modified the hypothetical to "exclude production rate piece work [meaning]

5   traditional assembly line work[.]"  (AR 62.)  The VE testified that such an individual would not be

6   able to perform Plaintiff's past relevant work, but could perform the other representative sample of

7   work identified in the first hypothetical, subject to "eroding the numbers in half."  (AR 62.)

8   Plaintiff's attorney finally asked whether a person "absent from work about three days per month"

9   would be able to sustain employment, and the VE testified that there would be no work for such a

10  hypothetical individual.  (AR 63.)

11      The ALJ asked whether the VE's testimony was consistent with the DOT and whether it

12  was modified at all by the VE's own experience.  (AR 63.)  The VE responded that his testimony

13  was consistent with the DOT and modified "[a]s far as eroding the data base according to the

14  production rate" based on his schooling, research, and work experience at placing clients in jobs.

15  (AR 63.)

16      **3.    Third Party Assessments and Reports**

17          **a.    Gail Rhinehart, Friend of Plaintiff**

18      Plaintiff's friend Gail Rhinehart completed a third party adult function report on February

19  25, 2102, noting she had known Plaintiff for more than a year and spent "at least" three days a

20  week with Plaintiff, between "the Hope Center, library, church, thrift shopping & store shop."

21  (AR 269; 273.)  Ms. Rhinehart noted Plaintiff "reads, paints, draws, does computer (*sic*), [and]

22  watches tv" during a regular day (AR 269) and often "has trouble sleeping" because she "gets

23  manic and can't sleep" (AR 270).   Ms. Rhinehart stated Plaintiff told her "she cooks eggs,

24  chicken, ham and frozen food & sandwiches" and as far as she knows, Plaintiff is able to clean, do

25  laundry, household repairs, ironing, mowing, and other household chores.  (AR 271.)  Plaintiff

26  goes outside "every day" and "walks a lot," as well as going out alone and shopping without aid.

27  (AR 272.)  Plaintiff "is a good artist" and "avid reader" but "there are times when she loses

28  interest, patience, and has period of depression when she can't" do these activities.  (AR 273.)

1 Plaintiff follows written instructions "ok" and spoken instructions "well, usually" (AR 274), and

2 gets along with authority figures "fairly well[,] but it's an effort a lot of the time" (AR 275).

3        **b.  Faith LaGore, Sister of Plaintiff**

4    Plaintiff's sister Faith LaGore completed a third party adult function report on February

5 26, 2012, noting she had known Plaintiff "all her life" and spent about 3-5 hours with her each

6 week providing transportation or cleaning her apartment.  (AR 277.)  Ms. LaGore noted Plaintiff

7 "sleeps when she should be awake" and will "still [be] working on [her] computer after midnight,"

8 her hair is "always messy" and "seems oily," and "she tends to dress like a homeless person."

9 (AR 278.)  Ms. LaGore stated Plaintiff's "mental skills have been degrading over time," and while

10 she is "physically able" to complete household chores, "mentally cleaning is tough" for her.

11 (AR 278-79.)  Plaintiff "needs helpers to sort through her stuff," but is able to cook "sandwiches

12 and simple foods" on her own.  (AR 279.)  Plaintiff goes outside "daily" and shops once a week

13 for about two hours for food and household supplies.  (AR 280.)  Plaintiff attends Hope Center

14 twice a week, church, and art league.  (AR 281.)

15    Plaintiff has problems getting along with family and friends, because "she inserts

16 comments that are not related to the current situation," and has short-term and long-term memory

17 problems.  (AR 282.)  Plaintiff's "mental processes become more fragmented when under stress,"

18 and she does not handle changes in routine well.  (AR 283.)  Ms. LaGore noted Plaintiff has

19 trouble following written directions because "her own notes of a to do list are not followed" and

20 difficulty following spoken directions because "you have to remind her weekly."  (AR 282.)

21 Plaintiff can only pay attention for 20-30 minutes at a time.  (AR 282.)

22        **c.  Janet Mulvihill, Peer Mentor**

23    Plaintiff's peer mentor from the Hope Recovery Center Janet Mulvihill completed a third

24 party adult function report on February 27, 2012, noting she had known Plaintiff for

25 approximately one year and saw her two days a week.  (AR 285.)  Ms. Mulvihill noted that

26 "except for being rather eccentric in her dressing," Plaintiff "appears to be able" to handle her own

27 personal care without help.  (AR 286.)  Ms. Mulvihill will "help her sort out her thoughts when

28 she is confused or frustrated," and Plaintiff "often needs to be reminded to pick up after herself."

1  (AR 287 ("extra time is needed to organize her thoughts & clean up the multiple projects she starts

2  at the same time").)   Plaintiff "is often flustered & needs help focusing[.]"   (AR 287.)

3  Ms. Mulvihill noted Plaintiff is given rides by others or uses public transportation (AR 286; 288),

4  and "often" "gets in trouble with money" (AR 288).

5       Plaintiff told Ms. Mulvihill she "comes to the Hope Center because it's 'safe' & [she] can

6  be around others who understand & do not judge her."  (AR 289.)  When she comes to the Hope

7  Center, Plaintiff "talks to everyone" and "flutters around; stands up – always moving – all while

8  fidgeting with something in her hands."  (AR 289.)  Plaintiff often "gets lost in the details" of

9  making lists, and "they are long & unfocused – flying off in multiple directions."  (AR 289.)

10  Plaintiff has difficulties completing tasks, concentrating, understanding, and following

11  instructions, and her concentration is worse around others.  (AR 290.)  Plaintiff follows spoken

12  instructions "minimally" and handles stress "with anxiety, increased confusion, decreased

13  concentration, [and] shakes."  (AR 290-91.)

14       **d.**     **Alexandra Giacotelli, Plaintiff's Friend/Co-Worker**

15       Plaintiff's friend and co-worker Alexandra Giacotelli completed a third party adult

16  function report on March 2, 2012, noting she had known Plaintiff for six years and currently

17  spends about five hours per week with her.  (AR 293.)  Ms. Giacotelli noted that "stress and

18  anxiety cause [Plaintiff] sleep problems every night" and "breaks in concentration."  (AR 294;

19  297.)  Plaintiff goes outside daily and is able to go alone, and goes shopping once or twice a week

20  for food, clothing, thrift stores, and books.  (AR 296.)  Plaintiff reads, paints, watches television,

21  and does other crafts and artwork each day, and is "very creative."  (AR 297.)  Plaintiff socializes

22  "in person – at work, family occasions, social center" as well as on the phone on a daily basis, and

23  does not need to be reminded to go places or have a chaperone when she attends social occasions

24  "5 days a w[ee]k, often more."  (AR 297.)

25       Ms. Giacotelli stated that Plaintiff has extensive physical limitations as well as limitations

26  with talking, memory, completing tasks, and concentration, but is able to walk 8 blocks without

27  resting, pay attention 30-60 minutes at a time, and follow written instructions "very well."

28  (AR 298.)

[Plaintiff] is in a constant state of anxiety & stress, some due to her financial realities, & some over-all.  Budget cuts at her job led to a demotion which was very difficult to accept, causing her to lose confidence & placing even more pressure on her to do all the physical aspects of the new job.  She also sustained a large loss in pay, adding to her worries about supporting herself.  She makes a monumental effort to "keep it together," but I see she is having a more & more difficult time keeping up with working, her financial situation, maintaining her household, etc.  Stress and anxiety are her constant companions & she expends a huge effort in getting through each day.

(AR 300.)

####         e.       Mary Frost, Aunt

Plaintiff's aunt Mary Frost wrote a letter to the agency on August 9, 2013, noting she had known Plaintiff for about four decades.  (AR 366-67.)   As a young woman, Plaintiff was "brilliant" and "capable of pretty much anything."  (AR 366.)  Since her brain injury, however, Plaintiff is unable to "keep it together to stay focused for very long" and Ms. Frost theorized that "this is due to the prescription drugs she took to keep out of pain – it must have burned out some brain cells."  (AR 366.)  Plaintiff "can't process thoughts" and is "mentally impaired," and "[b]ecause of the prescriptions she now takes to keep her head stable, and her inability to focus[,]" Plaintiff is both unable to work and is "a liability risk to any employer."  (AR 367.)  Ms. Frost notes Plaintiff "tends to get hurt easily because of her inability to perceive what is going on around her in her surroundings" and that at some point a "cart fell on [Plaintiff] and hurt her shoulder[.]" (AR 367.)

### C.    Administrative Proceedings

On August 20, 2013, the AJLJ issued a written decision and determined Plaintiff was not disabled.  (AR 11-23.)  The ALJ found that Plaintiff had severe impairments including status post-traumatic brain injury, schizoaffective disorder, anxiety disorder, and asthma.  (AR 16.)  The ALJ determined that these impairments did not meet or equal a listed impairment.  (AR 16-17.)  The ALJ found Plaintiff retained the residual functional capacity ("RFC")

. . . to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except she can stand and walk for up to six of eight hours, cumulatively; can sit for no more than six of eight hours, cumulatively; has unlimited capacity for pushing or pulling, except weight restrictions for lifting and carrying; can no more than frequently climb ramps or stairs, balance, stoop, kneel, crawl, or crouch; can never crawl or climb ladders or ropes; cannot tolerate concentrated exposure to

dangerous machines or unprotected heights; cannot tolerate moderate exposure to fumes and/or poor ventilation; is limited to the performance of simple, repetitive tasks; and can tolerate no more than occasional changes in work settings, exercise of judgment or decision-making, or contact with members of the public or co-workers.

(AR 30.)

Given this RFC, the ALJ found that Plaintiff was unable to perform any past relevant work.  (AR 21.)  After considering Plaintiff's age, education, work experience, and RFC, the ALJ determined there were other jobs that existed in significant numbers in the national economy she could perform.   (AR 23.)   The ALJ concluded that Plaintiff was not disabled, as defined in sections 216(i), 223(d), and 1614(a)(3)(A) of the Social Security Act.  (AR 23.)

The Appeals Council denied Plaintiff's request for review on October 30, 2013, making the ALJ's decision the Commissioner's final determination for purposes of judicial review.  (AR 4-9.)

**D.      Plaintiff's Complaint**

On January 9, 2014, Plaintiff filed a complaint before this Court seeking review of the ALJ's decision.  (Doc. 1.)  Plaintiff argues that the ALJ failed to articulate clear and convincing reasons for finding Plaintiff's statements less than fully credible.  (Doc. 12.)

### III.    SCOPE OF REVIEW

The Commissioner's decision that a claimant is not disabled will be upheld by a district court if the findings of fact are supported by substantial evidence in the record and the proper legal standards were applied.  42 U.S.C. § 405(g); *Lewis v. Astrue*, 498 F.3d 909, 911 (9th Cir. 2007); *Schneider v. Comm'r of the Soc. Sec. Admin.*, 223 F.3d 968, 973 (9th Cir. 2000); *Morgan v. Comm'r of the Soc. Sec. Admin.*, 169 F.3d 595, 599 (9th Cir. 1999); *Davis v. Heckler*, 868 F.2d 323, 325 (9th Cir. 1989); *Tackett v. Apfel*, 180 F.3d 1094, 1097 (9th Cir. 1999); *Tidwell v. Apfel*, 161 F.3d 599, 601 (9th Cir. 1999); *Miller v. Heckler*, 770 F.2d 845, 847 (9th Cir. 1985) (the findings of the Commissioner as to *any* fact, if supported by substantial evidence, are conclusive.)

Substantial evidence is more than a mere scintilla, but less than a preponderance.  *Ryan v. Comm'r of Soc. Sec.*, 528 F.3d 1194, 1198 (9th Cir. 2008); *Saelee v. Chater*, 94 F.3d 520, 521 (9th Cir. 1996).  "'It means such evidence as a reasonable mind might accept as adequate to support a

1  conclusion.'" *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v.*
2  *N.L.R.B.*, 305 U.S. 197, 229 (1938)).

3      "While inferences from the record can constitute substantial evidence, only those
4  'reasonably drawn from the record' will suffice." *Widmark v. Barnhart*, 454 F.3d 1063, 1066
5  (9th Cir. 2006) (citation omitted); *see also Desrosiers v. Sec'y of Health and Hum. Servs.*, 846
6  F.2d 573, 576 (9th Cir. 1988) (the Court must review the record as a whole, "weighing both the
7  evidence that supports and the evidence that detracts from the [Commissioner's] conclusion.")
8  The Court "must consider the entire record as a whole, weighing both the evidence that supports
9  and the evidence that detracts from the Commissioner's conclusion, and may not affirm simply by
10  isolating a specific quantum of supporting evidence." *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035
11  (9th Cir. 2007) (citation and internal quotation marks omitted).

12      The role of the Court is *not* to substitute its discretion in the place of the ALJ – "[t]he ALJ
13  is responsible for determining credibility, resolving conflicts in medical testimony, and resolving
14  ambiguities." *Edlund v. Massanari*, 253 F.3d 1152, 1156 (9th Cir. 2001) (citations omitted);
15  *Macri v. Chater*, 93 F.3d 540, 543 (9th Cir. 1996).  "Where the evidence is susceptible to more
16  than one rational interpretation, one of which supports the ALJ's decision, the ALJ's conclusion
17  must be upheld." *Thomas v. Barnhart*, 278 F.3d 947, 954 (9th Cir. 2002); *Andrews v. Shalala*, 53
18  F.3d 1035, 1041 (9th Cir. 1995); *see also Orn v. Astrue*, 495 F.3d 625, 630 (9th Cir. 2007) (the
19  court may review only the reasons stated by the ALJ in his decision "and may not affirm the ALJ
20  on a ground upon which he did not rely."); *see Sprague v. Bowen*, 812 F.2d 1226, 1229-30 (9th
21  Cir. 1987) (if substantial evidence supports the administrative findings, or if there is conflicting
22  evidence supporting a particular finding, the finding of the Commissioner is conclusive).  The
23  court will not reverse the Commissioner's decision if it is based on harmless error, which exists
24  only when it is "clear from the record that an ALJ's error was 'inconsequential to the ultimate
25  nondisability determination.'" *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 885 (9th Cir. 2006)
26  (quoting *Stout v. Comm'r*, 454 F.3d 1050, 1055 (9th Cir. 2006)); *see also Burch v. Barnhart*, 400
27  F.3d 676, 679 (9th Cir. 2005).

28  //

1                                    **IV.   APPLICABLE LAW**

2        An individual is considered disabled for purposes of disability benefits if he is unable to

3   engage in any substantial, gainful activity by reason of any medically determinable physical or

4   mental impairment that can be expected to result in death or that has lasted, or can be expected to

5   last, for a continuous period of not less than twelve months.   42 U.S.C. §§ 423(d)(1)(A),

6   1382c(a)(3) (A); *see also Barnhart v. Thomas*, 540 U.S. 20, 23 (2003).   The impairment or

7   impairments must result from anatomical, physiological, or psychological abnormalities that are

8   demonstrable by medically accepted clinical and laboratory diagnostic techniques and must be of

9   such severity that the claimant is not only unable to do his previous work, but cannot, considering

10  his age, education, and work experience, engage in any other kind of substantial, gainful work that

11  exists in the national economy.   42 U.S.C. §§ 423(d)(2)-(3), 1382c(a)(3)(B), (D).

12       The regulations provide that the ALJ must undertake a specific five-step sequential

13  analysis in the process of evaluating a disability.   In Step 1, the ALJ must determine whether the

14  claimant is currently engaged in substantial gainful activity.   20 C.F.R. §§ 404.1520(b),

15  416.920(b).   If not, the ALJ must determine at Step 2 whether the claimant has a severe

16  impairment or a combination of impairments significantly limiting her from performing basic

17  work activities.   *Id.* §§ 404.1520(c), 416.920(c).   If so, the ALJ moves to Step 3 and determines

18  whether the claimant has a severe impairment or combination of impairments that meet or equal

19  the requirements of the Listing of Impairments ("Listing"), 20 § 404, Subpart P, App. 1, and is

20  therefore presumptively disabled.   *Id.* §§ 404.1520(d), 416.920(d).   If not, at Step 4 the ALJ must

21  determine whether the claimant has sufficient RFC despite the impairment or various limitations

22  to perform her past work.   *Id.* §§ 404.1520(f), 416.920(f).   If not, at Step 5, the burden shifts to the

23  Commissioner to show that the claimant can perform other work that exists in significant numbers

24  in the national economy.   *Id.* §§ 404.1520(g), 416.920(g).   If a claimant is found to be disabled or

25  not disabled at any step in the sequence, there is no need to consider subsequent steps.   *Tackett v.*

26  *Apfel*, 180 F.3d 1094, 1098-99 (9th Cir. 1999); 20 C.F.R. §§ 404.1520, 416.920.

27  //

28  //

# V.   DISCUSSION

Plaintiff contends the ALJ failed to articulate clear and convincing reasons for discounting her statements regarding the severity and extent of her ongoing symptoms.  (Doc. 12, pp. 4-16.) Plaintiff asserts the ALJ improperly rejected Plaintiff's testimony "based on a belief that the testimony is not fully credible because [it] is inconsistent with what the ALJ believes it should be" and "because it lacks support in the objective medical evidence."  (Doc. 12, pp. 7-8.)  According to Plaintiff, "[n]othing in [her] testimony provides any indication that she is capable of performing anything other than a few basic daily activities and certainly not what is required of substantial gainful work activity[.]"  (Doc. 12, p. 5.)

The Commissioner responds that the ALJ determined Plaintiff did not have a medically determinable physical impairment, and therefore Plaintiff's pain testimony was inapposite to the ultimate finding that she was not disabled.  (Doc. 15, p. 17.)  Further, the Commissioner contends the ALJ properly found Plaintiff's statements about the alleged intensity, persistence, and limiting effects of her mental impairments to be less than fully credible based on the objective medical evidence, Plaintiff's own function report and hearing testimony, and the third-party statements contained within the record.  (Doc. 15, pp. 19-25.)

## 1.   Legal Standard

In evaluating the credibility of a claimant's testimony regarding subjective pain, an ALJ must engage in a two-step analysis.  *Vasquez v. Astrue*, 572 F.3d 586, 591 (9th Cir. 2009); *Bunnell v. Sullivan*, 947 F.2d 341, 344 (9th Cir. 1991) (en banc).  First, the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment that could reasonably be expected to produce the pain or other symptoms alleged.  *Vasquez*, 572 F.3d at 591. The claimant is not required to show that his impairment "could reasonably be expected to cause the severity of the symptom [he] has alleged; she need only show that it could reasonably have caused some degree of the symptom."  *Id.* (quoting *Lingenfelter*, 504 F.3d at 1036).  If the claimant meets the first test and there is no evidence of malingering, the ALJ can only reject the claimant's testimony about the severity of the symptoms if she gives "specific, clear and convincing reasons" for the rejection.  *Id.*

1    The ALJ also may consider (1) the claimant's reputation for truthfulness, prior inconsistent

2    statements, or other inconsistent testimony, (2) unexplained or inadequately explained failure to

3    seek treatment or to follow a prescribed course of treatment, and (3) the claimant's daily activities.

4    *Tommasetti v. Astrue*, 533 F.3d 1035, 1041 (9th Cir. 2008); *see also Bray v. Comm'r of Soc. Sec.*

5    *Admin.*, 554 F.3d 1219, 1226-27 (9th Cir. 2009); *Smolen v. Chater*, 80 F.3d 1273, 1284 (9th Cir.

6    1996); 20 C.F.R. §§ 404.1529, 416.929.   "If the ALJ's finding is supported by substantial

7    evidence, the court may not engage in second-guessing."  *Tommasetti*, 533 F.3d at 1039.

8    **2.    Because the ALJ Determined that Plaintiff Did Not Have a Medically**
     **Determinable Physical Impairment, the ALJ Was Not Required to Provide**
9    **Clear and Convincing Reasons to Reject Plaintiff's Pain Testimony**

10    In regard to Plaintiff's alleged physical impairments, the ALJ reviewed the medical record

11    from Plaintiff's original hospitalization for a head injury in February of 1995.  (AR 18-19.)  The

12    ALJ noted that while Plaintiff had occasionally reported headaches and neck muscle spasms,

13    restricted range of motion of the neck, and decreased muscle tone on the left side of her face since

14    that time, such complaints were not treated in any significant way or investigated by a single

15    objective report such as an X-ray or nerve testing.  (AR 18.)  The ALJ reviewed an examination

16    report which showed reduced range of motion of the lumbar spine and hyperreflexia, but no

17    significant limitations or other musculoskeletal abnormality.  (AR 18.)  The ALJ also noted that

18    Plaintiff has no relevant history of treatment for chronic or unmanageable pain, and that Plaintiff

19    stated that she does not regularly take any pain medication.  (AR 18.)  Though Plaintiff received a

20    prescription for Motrin and Flexeril in November of 2012 for a complaint of severe neck and back

21    pain, there is no evidence in the medical record that she ever returned for follow-up treatment or a

22    refill of that prescription.  (AR 18.)  The ALJ concluded that given "this minimal [ ] treatment

23    history and no real medical work-up, [he was] unable to find any medically determinable back or

24    neck pain impairment."  (AR 18.)

25    The ALJ also reviewed the medical record for evidence of treatment or work-up for head

26    injury or headache after the initial records post-traumatic brain injury.  (AR 18.)  The ALJ noted

27    that Plaintiff "does not regularly complain of headaches to her physicians and regularly takes no

28    pain medication" for her head injury.  (AR 18.)  Based on the medical record before him, the ALJ

1    concluded that Plaintiff did not have a medically determinable back or neck pain or severe

2    headache impairment. (AR 18; *see also* 20 C.F.R. § 416.908 ("A physical or mental impairment

3    must be established by medical evidence consisting of signs, symptoms, and laboratory findings,

4    not only by your statement of symptoms"); 42 U.S.C. §§ 423(d)(3), 1382c(a)(3)(D) (a "physical or

5    mental impairment" is one that "results from anatomical, physiological, or psychological

6    abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic

7    techniques").)  Plaintiff does not dispute this determination.  (*See* Doc. 12.)

8        An ALJ must determine a claimant has presented objective medical evidence of an

9    underlying impairment that could reasonably be expected to produce the pain or other symptoms

10   alleged as the first step of the two-step credibility analysis.  *Vasquez*, 572 F.3d at 591.  Only where

11   the claimant meets the first test does the ALJ have to move on to the second step, where the ALJ

12   must provide "specific, clear, and convincing reasons" for rejecting the claimant's subjective pain

13   testimony.  *Id.* (quoting *Lingenfelter*, 504 F.3d at 1036); *see Bunnell*, 947 F.2d at 345 ("once the

14   claimant produces objective medical evidence of an underlying impairment, an adjudicator may

15   not reject [the] claimant's subjective complaints based solely on a lack of objective medical

16   evidence to fully corroborate the alleged severity of pain" and "must specifically make findings"

17   supporting an adverse credibility finding).

18        "'Congress clearly meant that so long as the pain is associated with a clinically

19   demonstrated impairment, credible pain testimony should contribute to a determination of

20   disability.'"  *Bunnell*, 947 F.2d at 345.  While "[s]ymptoms can sometimes suggest a greater

21   severity of impairment than is demonstrated by objective and medical findings alone[,]" *Id.* at 345

22   (internal quotations and citation omitted), a claimant "can only establish an impairment if the

23   record includes signs – the results of 'medically acceptable clinical diagnostic techniques,' such as

24   tests – as well as symptoms, *i.e.*, [the claimant]'s representations regarding h[er] impairment"

25   *Ukolov v. Barnhart*, 420 F.3d 1002, 1005 (9th Cir. 2005).  A claimant's own subjective complaints

26   to a physician do not establish that she has a medically determinable physical impairment.  *See*

27   SSR 96-4p, 1996 WL 374187 ("[R]egardless of how many symptoms an individual alleges, or

28   how genuine the individual's complaints may appear to be, the existence of a medically

1  determinable physical or mental impairment cannot be established in the absence of objective

2  medical abnormalities; *i.e.*, medical signs and laboratory findings . . . .  In claims in which there

3  are no medical signs or laboratory findings to substantiate the existence of a medically

4  determinable physical or mental impairment, the individual must be found not disabled at step 2 of

5  the sequential evaluation process.")

6      Here, the ALJ determined that Plaintiff's alleged physical impairments of back pain, neck

7  pain, headache, and head injury were not medically determinable.  (AR 17-18.)  The only

8  impairment the ALJ found medically determinable that may have had resulted in a physical

9  impairment is post-status traumatic brain injury, which the ALJ found did not result in any

10 physical impairment.  (*See* AR 17-19.)  Plaintiff does not contend that the ALJ improperly reached

11 this determination (*see* Doc. 12).  In addition to there being no medically determinable physical

12 impairment to which Plaintiff's pain allegation might be relevant, the sparse mentions in the

13 record support the ALJ's rejection of Plaintiff's pain testimony.  The only mentions of pain within

14 the medical record were made in the context of Plaintiff's complaints of neck and back pain; at no

15 point was a complaint of pain made in the context of treatment for Plaintiff's post-traumatic brain

16 injury.  (AR 18; *see also* AR 470; 504; 619; 625.)  The only mentions of pain during testimony

17 were Plaintiff's complaints of back pain, and were not made in the context of Plaintiff's post-

18 traumatic brain injury.  (*See* AR 31-66; 251-57; 313-20.)  Plaintiff offered no evidence, argument,

19 or testimony establishing a nexus between her medically determinable impairment of post-

20 traumatic brain injury and her sporadic complaints of pain.

21      In the absence of any medically determinable impairment linked to or correlated with

22 Plaintiff's subjective pain testimony, the ALJ was not obligated to either address Plaintiff's

23 allegations of pain or make a finding on Plaintiff's credibility.[4]

24 //

25 //

26 _____

27 [4]    Even had the ALJ been obligated to address Plaintiff's allegations of disabling pain, the inconsistencies between the medical record, which contained minimal evidence of complaints of pain and no diagnosis of any condition causally linked to Plaintiff's minimal complaints of pain, the third party adult function reports, which omitted any mention of any pain, do not establish any nexus between Plaintiff's sparse allegations of pain and her medically

28 determinable impairment of status-post traumatic brain injury.  (AR 18; 20-21.)

### 3.   The ALJ Properly Discounted Plaintiff's Testimony Regarding the Alleged Intensity, Persistence, and Limiting Effects of Her Mental Impairments

In regard to Plaintiff's alleged mental impairments, the ALJ reviewed claimant's more extensive treatment history.   (AR 19-20.)   The ALJ considered a detailed ten-year old psychological examination showing average cognition, average to low average memory, inflexible personality, decreased attention, average awareness, and endorsed feelings of frustration with Plaintiff's supervisor.  (AR 19.)  The ALJ also considered Plaintiff's counseling and psychiatric medication treatment at National Health Service, including a June 2009 mental status examination that reflected mild functional impairment in the occupational area and activities of daily living, and moderate impairment in social/interpersonal functioning.  (AR 19.)  The ALJ noted Plaintiff had been diagnosed with panic disorder with agoraphobia and generalized anxiety disorder. (AR 19.)  The ALJ also noted that at Plaintiff's most recent mental status examination, Plaintiff's appearance, affect, and orientation were appropriate, her intellect was average, her reasoning, impulse control, judgment, and insight were fair, and her attention was normal.  (AR 19.)

The ALJ evaluated treating physician Dr. Mai's opinion that Plaintiff has generalized anxiety disorder, subchronic panic disorder, and schizoaffective disorder, and that Plaintiff is "stable" on her current medication.  (AR 19.)  The ALJ noted Dr. Mai's opinion that Plaintiff has difficulty with detailed instructions and dealing with the general public, and is expected to have excessive absences, and gave great weight to Dr. Mai's assessments.   (AR 19.)   The ALJ incorporated Dr. Mai's opinion directly in his RFC, limiting Plaintiff's exposure to simple, repetitive tasks and no more than occasional interaction with others, to prevent frequent exacerbations of her underlying mental illnesses that would cause excessive workplace absences. (AR 19.)

Finally, the ALJ reviewed the testimony of the ME at the hearing, and explicitly adopted the ME's testimony that Plaintiff has mild limitations in her ability to maintain activities of daily living, no episodes of extended-duration decompensation, and moderate limitations in her abilities to maintain social functioning and concentration, persistence, and pace.  (AR 20.)  Based on the medical opinions in the record, the ALJ determined that Plaintiff's severe status post-traumatic brain injury, schizoaffective disorder, and anxiety disorder were medically determinable mental

1    impairments.  (AR 20.)

2         Having found underlying medically determinable mental impairments, the ALJ moved on

3    to the second step of the two-step analysis to determine the intensity, persistence, and limiting

4    effects of Plaintiff's symptoms to determine the extent to which they actually limit Plaintiff's

5    functioning.  (AR 19-21; *see Vasquez*, 572 F.3d at 591.)   Because the ALJ determined that

6    Plaintiff had met the first test and did not find evidence of malingering, the ALJ was required to

7    provide "specific, clear and convincing reasons" for rejecting Plaintiff's subjective testimony

8    about the severity of her symptoms.  *Id.*  (quoting *Lingenfelter*, 504 F.3d at 1036).

9         Plaintiff argues the ALJ improperly discounted her credibility "because it lacks support in

10   the objective medical evidence."  (Doc. 15, pp. 7-8.)  The Commissioner disagrees, arguing the

11   ALJ properly relied on the objective medical evidence in the record to support his rejection of

12   Plaintiff's testimony on the intensity, persistence, and limiting effects of her medically

13   determinable mental impairment.  (Doc. 15, pp. 19-25.)  While the inconsistency of objective

14   findings with subjective claims may not be the sole reason for rejecting subjective complaints of

15   pain, *Light v. Soc. Sec. Admin.*, 119 F.3d 789, 792 (9th Cir. 1997), it is one factor which may be

16   permissibly considered with others, *Moisa v. Barnhart*, 367 F.3d 882, 885 (9th Cir. 2004);

17   *Morgan v. Comm'r of Soc. Sec. Admin.*, 169 F.3d 595, 600 (9th Cir. 1999).

18        Here, for example, the ALJ pointed to the inconsistencies between Plaintiff's report of

19   limitations from her mental impairments and her history of stability in response to psychiatric

20   medication, her lack of any history of psychiatric hospitalization, and detailed treatment notes

21   reflecting only mild to moderate limitations.  (AR 21; *see* AR 19-20.)  Plaintiff's IQ was

22   "average" in 2002 and mental status examinations from June 2009 through June 2013 reflected

23   largely normal attention and behavior, appropriate appearance and affect, average intellect, fair

24   reasoning, impulse control, judgment, and insight, and logical thought processes.  (AR 19; *see also*

25   AR 396-98, 413-14, 470-72, 514-15, 524-26, 619-21, 622-24, 616-18; 625-27, 628-29.)  Though

26   Plaintiff's treating physician, Dr. Mai, opined that Plaintiff may have suffered a degraded intellect

27   due to her injury, at no time did any physician opine that Plaintiff's current intellect was anything

28   less than "average."  (*Compare* AR 611-12 *with* 48-51.)  The ALJ incorporated into his RFC

1    assessment Plaintiff's treating physician's opinion that Plaintiff had problems dealing with others

2    and working with detailed instructions, and the ME's opinion that Plaintiff must be precluded

3    from any assembly-line work and was mildly limited in her ability to maintain activities of daily

4    living and moderately limited in her abilities to maintain social functioning and concentration,

5    persistence, and pace.  (AR 20.)

6         While the lack of objective medical evidence supporting Plaintiff's claim cannot form the

7    sole basis for discounting her allegations, it is clearly a factor the ALJ may consider in his

8    credibility analysis.  *See Burch*, 400 F.3d at 681.   Here, the ALJ pointed to substantial medical

9    evidence within the medical record, including observations and notes by treating clinicians at the

10   National Health Service and treating physician Dr. Mai to support his conclusion that Plaintiff was

11   stable, with only mild to moderate limitations imposed by her medically determinable mental

12   impairments.  Plaintiff's statements that she was unable to work due to her mental impairments

13   were unsupported by a medical record that reflected a reduced – but still average – intellect,

14   appropriate appearance and affect, fair reasoning, impulse control, judgment, and insight, and

15   logical thought processes.  (AR 19.)

16        Plaintiff also contends the ALJ improperly rejected her subjective testimony because he

17   believed it to be "inconsistent" with "what he believed it should be."  (Doc. 12, pp. 7-8.)  Plaintiff

18   takes particular issue with the fact that the ALJ pointed to her "sporadic" activities of daily living

19   as proof she was capable of performing full-time work – Plaintiff asserts that "[n]othing in [her]

20   testimony provides any indication that she is capable of performing anything other than a few

21   basic daily activities and certainly not what is required of substantial gainful work activity[.]"

22   (Doc. 12, p. 5.)   The Commissioner responds that the ALJ properly relied on Plaintiff's own

23   function report and hearing testimony, and the third-party statements contained within the record

24   to discount her credibility.  (Doc. 15, pp. 19-25.)

25        While the mere fact that a claimant engages in certain daily activities does not necessarily

26   detract from her credibility as to overall disability, daily activities support an adverse credibility

27   finding if a claimant is able to spend a substantial part of her day engaged in pursuits involving the

28   performance of physical functions or skills that are transferable to a work setting.  *Orn*, 495 F.3d

at 639; *see also Thomas*, 278 F.3d at 959.  A claimant's performance of chores such as preparing meals, cleaning house, doing laundry, shopping, occasional childcare, and interacting with others has been considered sufficient evidence to support an adverse credibility finding when performed for a substantial portion of the day.  *See Stubbs-Danielson v. Astrue*, 539 F.3d 1169, 1175 (9th Cir. 2008); *Burch v. Barnhart*, 400 F.3d 676, 680-81 (9th Cir. 2005); *Thomas*, 278 F.3d at 959.

Here, the ALJ appropriately considered the third party adult function reports identifying the breadth of Plaintiff's activities of daily living:

> The claimant's friend, Gail Rhinehart, stated the claimant goes out every day and walks a lot.  Ms. Rhinehart stated she sees the clamant at least three times a week, at Hope Center, library, church, thrift shopping, and at the dollar shore (Exhibit 4-E).  The claimant reads, paints, draws, does computer (*sic*), and watches television (Exhibit 4-E).  Alexandra Giacotelli, the claimant's friend, states the claimant goes out every day (Exhibit 7-E).  Ms. Giacotelli states the claimant does art work daily and is very creative, and socializes daily (Exhibit 7-E).  The claimant's peer mentor at Hope Center, Janet Mulvihill, states she sees the claimant twice a week, and sees her use the computer, visit with others, and do craft activities (Exhibit 6-E).  She is a bit fidgety and anxious and does better by herself (chatters too much) (Exhibit 6-E).  The claimant's aunt, Mary Frost, states the claimant's ability to concentrate or think is poor: she is anxious and scattered (Exhibit 20-E).  The claimant's sister, Faith LaGore, states the claimant's grooming is poor, she stays up late working on the computer, and she is generally disorganized and scattered (Exhibit 5-E).  These third party statements are credible and generally consistent with one another and the treatment record.  They describe a person who is active and engaged, but who has problems with focus, concentration, persistence, and organization, and whose distractibility problems are perhaps exacerbated by contact with others.

(AR 20.)  These activities are inconsistent with the extremely limited activities alleged by Plaintiff in her adult function report.  (*See, e.g.,* AR 270-73 (stating Plaintiff did not have problems with personal care, could cook for herself and perform household chores, went out every day and walked a lot, did her own shopping, and spent time with others on social activities); 277-84 (stating Plaintiff could cook for herself and perform household chores, went out daily, did her own shopping, and spent time with others on social activities); 285-92 (stating Plaintiff attended Hope Center twice a week, did not have problems with personal care, went out daily, and was able to socialize though she was better on her own); 293-300 (stating Plaintiff did not have problems with personal care, could cook for herself and perform household chores, went out daily, did her own shopping, and spent time with others on social activities)*;* AR 313-20 (Plaintiff's own report

1  admitting she shops on her own, visits and socializes with others, but has difficulties taking care of

2  her own personal care and only "rarely" goes outside).)

3      Contrary to Plaintiff's contention, the activities described in these adult function reports

4  are not "sporadic and limited." (*See* Doc. 12, pp. 9.)  This is not a case where the Plaintiff testified

5  that she was completely dependent for her activities of daily living.  Plaintiff lived independently

6  prior to marrying, sustained a social relationship and married, prepared her own meals, performed

7  light household chores, went for daily walks, shopped for groceries, completed full work days, and

8  visited with others.  (AR 46-47; 313-20.) These types of activities tend to suggest Plaintiff is still

9  capable of performing the basic demands of light, unskilled work on a sustained basis.  *See, e.g.,*

10  *Stubbs-Danielson*, 539 F.3d at 1175 (the ALJ sufficiently explained his reasons for discrediting

11  the claimant's testimony because the record reflected that the claimant performed normal activities

12  of daily living, including cooking, housecleaning, doing laundry, and helping her husband in

13  managing finances – all of which "tend[ed] to suggest that the claimant may still be capable of

14  performing the basic demands of competitive, remunerative, unskilled work on a sustained

15  basis"); *Burch*, 400 F.3d at 680 (the ALJ sufficiently explained his reasons for discrediting the

16  claimant's testimony because the record "suggest[ed] that she is quit functional.  She is able to

17  care for her own personal needs, cook, clean and shop.  She interacts with her nephew and her

18  boyfriend").  *See also Valentine v. Astrue*, 574 F.3d 685, 694 (9th Cir. 2009) (ALJ properly

19  recognized that daily activities "did not suggest [the claimant] could return to his old job" but "did

20  suggest that [the claimant's] later claims about the severity of his limitations were exaggerated").

21  While Plaintiff prefers having a routine and has challenges dealing with the public, her ability to

22  follow instructions, be productive, act appropriately at work, handle her own daily needs, engage

23  in hobbies, and socialize are inconsistent with her claimed total inability to work.  (AR 313-20);

24  *see also* AR 579-85 (Plaintiff's work journal detailing her various difficulties in finishing a full

25  workweek and confirming her ability to finish such a workday).)

26      Here, the ALJ pointed to substantial evidence within the record to support a finding that

27  the breadth of Plaintiff's admitted daily activities and the underlying medical condition established

28  by the medical record were inconsistent with Plaintiff's subjective complaints of disabling

functional limitations.  In addition to noting that Plaintiff's admitted activities of daily living and the medical record supported only mild to moderate impairments in her ability to maintain activities of daily living, social functioning, and concentration, persistence, and pace, the ALJ noted that Plaintiff's "ability to work in spite of her mental symptoms for many years after her head injury suggests her symptoms are not as severe as she claims they are."  (AR 21 (noting Plaintiff managed to earn amounts over substantial gainful activity in 2009, 2008, 2007, 2006, 2003, 2002, 2001, 2000, 1999, 1998, 1997, and 1996, and "significant amounts" in 2011, 2010, 2005, and 2004).)  The ALJ properly relied on Plaintiff's work history in discounting Plaintiff's own testimony about the extent of her limitations.  *See Bray*, 554 F.3d at 1227 (claimant's active lifestyle and work record, among other things, "belie [her] claim of debilitating [ ] illness").

The Court is not tasked with substituting its discretion in the place of that of the ALJ, *Edlund*, 253 F.3d at 1156; *Macri*, 93 F.3d at 534; where "the ALJ's credibility finding is supported by substantial evidence in the record, [the Court] may not engage in second-guessing[,]" *Thomas*, 278 F.3d at 959.  The ALJ articulated clear and convincing reasons for rejecting Plaintiff's subjective complaints, and permissibly discounted her credibility.  *Cf. Batson v. Comm'r of Soc. Sec. Admin.*, 359 F.3d 1190, 1196 (9th Cir. 2004).

In sum, the ALJ's reasons were properly supported by the record and sufficiently specific to allow the Court to conclude that he rejected Plaintiff's testimony on permissible grounds, and did not arbitrarily discredit Plaintiff's testimony.

## CONCLUSION

Based on the foregoing, the Court finds that the ALJ's decision is supported by substantial evidence in the record as a whole and is based on proper legal standards.  Accordingly, the Court DENIES Plaintiff's appeal from the administrative decision of the Commissioner of Social Security.  The Clerk of this Court is DIRECTED to enter judgment in favor of Carolyn W. Colvin, Acting Commissioner of Social Security, and against Plaintiff Rhonda Lee McIntire.

IT IS SO ORDERED.

Dated:  __August 4, 2015__                    _____/s/ Sheila K. Oberto__
                                                      UNITED STATES MAGISTRATE JUDGE